**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

HARRIS CORPORATION,

       Plaintiff,

  v.

RUCKUS WIRELESS, INC.,

       Defendant.

Case No. 6:11-cv-00618-CEM-KRS

**DEFENDANT RUCKUS WIRELESS, INC.'S *DAUBERT* MOTION TO EXCLUDE THE
TESTIMONY AND OPINIONS OF DR. NISHA MARIE MODY, PH.D. AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**

Defendant Ruckus Wireless, Inc. ("Ruckus") hereby moves this Court for an order excluding testimony and opinions of Harris Corporation's ("Harris") damages expert, Dr. Nisha Marie Mody, Ph.D., pursuant to binding Federal Circuit case law, Federal Rule of Evidence 702, and the standards for admissibility of expert testimony in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    <u>INTRODUCTION</u>

This Court should exclude Dr. Mody's expert opinion for two separate and independent reasons.  First, Dr. Mody failed to apply binding Federal Circuit case law that requires damages experts in patent infringement cases to determine a royalty rate by performing an analysis of the specific components within the accused products that implement the patented technology.  The Federal Circuit has made clear that plaintiffs in patent actions involving multi-component products cannot base their damages analysis on the entire accused product because doing so overstates plaintiff's damages and ignores non-patented features and contributions from other parties in the accused products.

The accused products in this case fall squarely into the Federal Circuit's mandate.  Ruckus's products are WiFi access points that allow devices with WiFi capability (laptops, smartphones, iPads) to wirelessly connect to the internet.  These WiFi access points are typically installed on the walls or in the ceilings of office buildings, schools, hospitals, etc.  They are made up of hundreds of different electronic components and are designed to operate pursuant to the IEEE 802.11 standard, which governs WiFi radio transmissions.  The 802.11 standard is written and periodically updated by a working group comprised of companies that have contributed to the technology found in WiFi devices.

In this case, Harris's patented technology involves the transmission of wireless signals involving the accused access points' WiFi radio and antenna and related circuitry. Under Federal Circuit case law, Dr. Mody was required to analyze the cost and profitability of those specific components when calculating the royalty, but she failed to do so. Instead, Dr. Mody claimed that she was entitled to base her damages analysis on the entire access point, which includes many non-patented and unrelated components and features. That is simply wrong as a matter of law.

Second, Dr. Mody's opinions should be stricken because she calculated a royalty based on an improper margin calculation and subsequent application of the *Georgia-Pacific* factors. As described more fully below, Dr. Mody conducted a margin analysis between accused and non-accused products without knowing the differences between the two, and she conducted an improper and unreliable operating cost analysis. As a result, Dr. Mody's calculations are overstated and unreliable.

## II.   BACKGROUND

On March 5, 2012, Dr. Mody submitted an initial expert report, opining on the royalty rate Ruckus should pay Harris for a license to U.S. Patent No. 6,504,515 (the "'515 patent") and U.S. Patent No. 7,916,684 (the "'684 patent") (together, the "patents-in-suit"). (*See* Expert Report of Dr. Nisha Marie Mody, Ph.D., dated March 5, 2012, attached hereto as Exhibit A). Three years later following the re-examination proceedings of the '684 patent, on March 6, 2015, Dr. Mody served a supplemental damages report, and opined that Ruckus would have agreed to license the '515 patent for 3.5% of net revenue from its access point sales, the '684 patent for 4.5% of net revenue, and both patents combined for 8% of net revenue. (*See* Supplemental

Expert Report of Dr. Nisha Marie Mody, Ph.D., dated March 6, 2015, attached hereto as Exhibit B, at pp. 10-11).

Adopting substantially the same analysis from her initial report in her Supplemental Report, Dr. Mody failed to abide by intervening Federal Circuit case law requiring patent damages experts to analyze the specific components in the accused products that are required to implement the patented technology. After bizarrely claiming that WiFi access points cannot be broken down into smaller components, Dr. Mody failed to identify, and base her royalty analysis on, the specific components within the accused access points that implement Harris's patented technology (e.g., the WiFi radio, antennae, etc.). Instead, Dr. Mody based her royalty analysis on the entire access point, which is made up of ***hundreds of components***, most of which have nothing to do with the patented technology in this case, and on which Harris is not entitled to damages. Dr. Mody's approach is plainly contrary to the Federal Circuit's repeated directives for calculating damages in patent infringement cases and should be excluded.

Rather than conducting a component analysis, Dr. Mody determined her proposed royalty by comparing the gross margin of the Ruckus products accused of infringing the '515 Patent ("the '515 Accused Products") and the gross margin of the Ruckus products accused of infringing the '684 Patent ("the '684 Accused Products") against the gross margin of other products that Ruckus sells that are not accused of infringement in this case. (*See* Exh. B at p. 5). The non-accused products included other access points, as well as accessories and replacement parts that Ruckus sells. (*See* Transcript of Deposition of Dr. Nisha M. Mody, taken April 8, 2015, attached hereto as Exhibit C, at 246:12:247-7; 248:10-12). Dr. Mody determined that the gross margin of the '515 Accused Products is 11% higher than the gross margin of non-accused products, and that the gross margin of the '684 Accused Products is 15% higher than the gross

margin of non-accused products.   (*See* Exh. B at p. 5).[1]  Although Dr. Mody claimed that she was attempting to isolate the value of the patented technology over non-accused products, Dr. Mody admitted that she did not understand anything about the differences between the accused and non-accused products, or--critically--whether the only difference between the accused and non-accused products was the inclusion of Harris's patented technology.  (*See* Exh. C at 214:6-21; 270:10-18).

Dr. Mody next attempted to determine Ruckus's contribution to the gross margin versus Harris's contribution to the gross margin.  She opined that because Ruckus's operating expenses are 40% of Ruckus's net revenue, Ruckus only contributes 40% to the Alleged Incremental margin, while Harris's patented technology constitutes the remaining 60%.  (Exh. B at pp. 5-6).  Put another way, Dr. Mody assumed that nearly ***all*** of Ruckus's gross profit was attributable to Harris.  Dr. Mody then multiplied Harris's alleged 60% contribution by the Alleged Incremental Margin to determine a starting point for the royalty rate in a hypothetical negotiation.  Specifically, Dr. Mody alleges that the starting point royalty rate for the '515 patent is 6.6% of revenue (60% * 11%) and the starting point royalty rate for the '684 patent is 9% of revenue (60% * 15%).  (Exh. B at pp.5-6).    Dr. Mody then purported to apply the factors set forth in *Georgia-Pacific v. U.S. Plywood Corp.* ("*Georgia-Pacific*") [2] and concluded that an appropriate royalty rate is 8% of revenue for products infringing both patents, 3.5% of revenue for products infringing the '515 patent, and 4.5% of revenue for products infringing the '684 patent.  (*See* Exh. B p. 11).  At no point did Dr. Mody conduct the apportionment analysis required by the

---

[1] The difference between the gross margin of the Accused Products and the non-accused products will be referred to herein as the "Alleged Incremental Margin."

[2] 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir. 1971), *cert. denied* 404 U.S. 870 (1971).

Federal Circuit related to the identification of the specific components in the accused products that perform the patented technology.

## III.   LEGAL STANDARDS

### A.  STANDARDS FOR THE EXCLUSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 requires that experts base opinions on sufficient facts or data, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case.  Vigilance in the assessment of expert testimony is critical, because of its powerful influence on untrained jurors.  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590 and 595. Because an expert's opinion "may be assigned talismanic significance in the eyes of lay jurors[,]" *Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1161 (S.D. Fla. 2007), the trial court must serve as a "gatekeeper to insure that speculative and unreliable [expert] opinions do not reach the jury." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).  In its gatekeeper role, the court considers whether "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (citations omitted); *see also Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) (explaining that a court should "exclude evidence if it is based upon unreliable principles or methods, or legally insufficient facts or data.")

The court must exercise its "basic gatekeeping obligation" to ensure that Dr. Mody's damages testimony is both reliable and "tied to the relevant facts and circumstances of this particular case." *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, 2013 WL 4538210, at *2 (N.D. Cal. 2013), citing *Daubert*, 509 U.S. at 598; *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

An expert's "conclusions [must be] supported by good grounds for each step in the analysis," meaning "that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d at 1245.  Generally speaking, "[e]xperts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.' " *GPNE Corp. v. Apple Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. 2014).

Assessment of the admissibility of expert opinion "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  In particular, a patent damage expert's opinions must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  Harris has the burden of establishing the admissibility of Dr. Mody's opinion by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592 n. 10; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092 (11th Cir. 2005).

In patent cases, expert testimony on damages is not permitted where it is "not a reliable means of calculating a reasonable royalty." *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385--86 (Fed. Cir. 2003) (affirming the trial court's exclusion of expert's testimony under Rule 702 and Daubert); *accord IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 688-89 (E.D. Tex. 2010) (Rader, J.).  Although the Federal Circuit allows for "some approximation" in the reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, at *2 (N.D.N.Y. 2008).

## B. __FEDERAL CIRCUIT LAW ON PATENT DAMAGES__

In recent years, the United States Court of Appeals for the Federal Circuit has provided detailed guidance on patent infringement damages calculations.  In particular, the Federal Circuit has sharply curtailed the application of the Entire Market Value Rule ("EMVR"), which allowed plaintiffs simply to assess royalties based on the entire market value of the accused products, without looking further at the specific components that implement the accused functionality.  *See Uniloc* 632 F.3d at 1318  (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1549-50 (Fed. Cir. 1995)).  The EMVR can no longer be used to assess damages with a multi-component product, such as the accused WiFi access points, because the alleged infringement relates only to a few of the hundreds of components that make up the product.

In a series of opinions since the submission of initial reports in this case in 2012, the Federal Circuit has instructed parties in patent infringement cases how to identify and calculate the appropriate royalty base in multi-component products, such as the accused WiFi products here.  In *LaserDynamics*, the Federal Circuit held that it is improper for a damages expert to calculate the royalty base on the entire accused product unless the patentee proves that the "patented feature drives the demand for [the] entire multi-component product." *LaserDynamics,* 694 F.3d at 67.  The Federal Circuit stated "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.  Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"  *Id*. at 78.   Accordingly, a patentee must analyze the specific components that implement the accused functionality as part of the royalty analysis.

Next, in *VirnetX v. Cisco Systems, Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014), the Federal Circuit again refined the damages guidance, requiring plaintiffs to conduct a further apportionment analysis on the components performing the accused functionality, recognizing that there may be many contributions and patented features contained in that component.  The Federal Circuit instructed that the "the requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment."  If the smallest salable unit is also itself a multi-component product containing non-infringing features, the patentee "must do more to estimate what portion of the value of that product is attributable to the patented technology. To hold otherwise would permit the entire market value exception to swallow the rule of apportionment."  *Id.* at 1327-1328.  In other words, a patentee must do more than simply identify the relevant components that perform the accused functionality.  The patentee must next analyze the patentee's contribution to the smallest salable unit (e.g., here, the WiFi radio and antennae) relative to other contributions and features.

The District Courts have followed the Federal Circuit's guidance in patent cases, requiring parties to include in their royalty calculation of an analysis of the components that are required to perform the patented technology.  For example, *In re Innovatio IP Ventures, LLC Patent Litigation*, 2013 WL 5593609, at *12 (N.D. Ill. 2013) is a widely-recognized and oft-cited patent infringement case involving WiFi devices, including WiFi access points like the ones accused in this case.  Like Dr. Mody, the plaintiff in *Innovatio* argued that damages should be calculated based on the **entire** WiFi access point.  *In re Innovatio IP Ventures, LLC Patent Litigation*, No. 11-C-9308, 2013 WL 5593609, at *12 (N.D. Ill. Oct. 3, 2013).  The defendants argued that damages should not be based on the entire access point, but rather only on the WiFi

radio chip inside the device that implemented the accused WiFi technology. *Id*. Following Federal Circuit precedent, the district court agreed with the defendants and held that damages should be based on the WiFi radio chip, which is the component that implemented the patented technology in the accused products. *Id*. at *8.[3]

Other district courts have required patentees to identify the components that practice the accused functionality as part of their damages analysis, and have excluded opinions that fail to follow the Federal Circuit's directives. *See, e.g.*, *Wi-LAN Inc. v. Alcatel-Lucent USA, Inc.*, 2013 WL 10404065, at *6 (E.D. Tex. 2013) (striking plaintiff's expert's damages analysis for failure to consider the components that performed the patented technology); *Brocade Communications Sys., Inc. v. A10 Networks, Inc.*, , 2013 WL 831528, at *14-15 (N.D. Cal. 2013) (granting a motion for a new trial because Brocade presented no evidence that the patented features drove demand for the entire accused product); *Rolls-Royce PLC v. United Techs. Corp.*, 2011 WL 1740143 (E.D. Va. 2011) (granting defendant's motion *in limine* to exclude damages calculation based on sales of an entire jet engine, when the patent-in-suit covered only the fan blade, one of thousands of components in the engine); *Invento AG v. Otis Elevator Co.*, 2011 U.S. Dist. LEXIS 88965 (S.D. N.Y. 2011) (granting a *motion in limine* excluding damages calculation based on an entire elevator, when the patent only covered the elevator's dispatch system); *CareFusion 303, Inc. v. Sigma Int'l*, 2012 WL 392808 (S.D. Cal. 2012) (holding EMVR only applies when the patented technology is the basis for demand); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 2012 WL 1142537 (N.D. Cal. 2012) (excluding opinion of the

---

[3] While the opinion in *Innovatio* ultimately determined the royalty rate based on the plaintiff's contractual obligation to license its patents on Fair, Reasonable, and Non-Discriminatory Terms ("FRAND"), the court's analysis regarding the identification of the components necessary to implement the accused functionality is applicable here.

plaintiff's damages expert because plaintiff failed to compare the patented features of the device to the non-patented features).

IV.   **ARGUMENT**

A.   **DR. MODY FAILED TO CONDUCT AN APPORTIONMENT ANALYSIS OF THE ACCUSED PRODUCTS' COMPONENTS TO ISOLATE THE VALUE ATTRIBUTABLE TO THE PATENTS IN SUIT**

Contrary to Federal Circuit directives, Dr. Mody failed to conduct any apportionment analysis of the components in the accused products necessary to implement the patented technology.  Dr. Mody did not take any steps to identify the smallest salable patent-practicing unit, or isolate the components necessary to implement Harris's technology, and there is no analysis of it in her Supplemental Report.  When asked at deposition whether she formed an opinion as to which components in the accused WiFi access points were required to implement the patented technology, Dr. Mody testified that she did not have any such opinion because "there is no smallest salable unit in this matter."  (*See* Exh. C at 273:5-16).  That is simply wrong--even a cursory inspection of the accused devices shows that they are made up of hundreds of parts.[4]

Dr. Mody testified that she was not required to conduct a component apportionment analysis because the accused products "are made to do one thing.  They're not multi-component products, where they take a camera photos and they provide a shot spot, and you can call on them and text on them…these are products that are meant to do one thing."  (*Id*. at 283:2-12).  In Dr. Mody's view, it seems, it is the end user ***features***, and not the ***components*** of the product, that matters.

---

[4] At the Court's request, Ruckus is willing to provide physical samples of the accused access points.  Opening the casing will reveal that they are made up of hundreds of components.

But years of Federal Circuit and District Court case law, some of which involves the same multi-component WiFi access points in this case, prove Dr. Mody wrong. The accused WiFi access points are made up of hundreds of components, which are itemized on Bills of Materials ("BOM"), and assembled by Ruckus's third party manufacturers to form a completed access point.[5] Each of these components has an associated cost. Harris is not entitled to damages on every component. Even Dr. Mody admitted that not every component is required to implement the patented technology. (*Id*. at 286:21-287:3 ("**Q.** Do you--do you believe that the accused technology--the patented technology is performed by some component or series of components of the accused products? **A.** I imagine it's performed by certain portions of--of--of an item. I don't imagine it's performed by the plastic that might surround it, or something like that.")).

Indeed, hundreds of other components make up the accused products and are not related to the patented technology; this is precisely why the Federal Circuit has dictated that it is incumbent upon Dr. Mody to conduct a damages analysis that takes into account **only** the components that are necessary to practice the claimed inventions. *See LaserDynamics*, 694 F.3d at 67, 70 (holding that in cases involving products with multiple components, the patentee must base its damages analysis on the smallest salable patent-practicing units, or components,

---

[5] While Dr. Mody testified that she did not understand the BOMs produced by Ruckus in this case, she ultimately testified that she did not need any further documents to more accurately or more fully complete her damages analysis because her damages analysis "is sound the way it is." (Exh. C at 280:7-21).

necessary for practicing the claimed inventions).[6]  Dr. Mody's opinion is simply contrary to well-settled Federal Circuit case law that Harris is not entitled to damages on the entire access point, but rather only on those components that relate to the patented technology.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention.")

Unlike Dr. Mody, Ruckus's damages expert, Richard Ostiller, followed the Federal Circuit's damages guidance by identifying the accused products components that are necessary to practice the claimed inventions.  Specifically, Mr. Ostiller considered four components: 1) the CPU and Baseband Chipset, which includes the WiFi radios; 2) the Antenna and Antenna Control, which are used to transmit the WiFi signals; 3) the Ethernet-related Circuitry that connect the access point to the internet; and 4) the Power-over-Ethernet related Circuitry.  Using the prices from the bills of materials, Mr. Ostiller determined the costs of these components, as a percentage of the total costs of the accused products, when conducting his royalty analysis.  In doing so, Mr. Ostiller isolated the components required to practice the claimed inventions, as the Federal Circuit requires parties in patent infringement cases to do.  He then conducted a ***further*** apportionment analysis to isolate Harris's contribution to these particular components, as the Federal Circuit also requires.

---

[6] Dr. Mody claimed that she did not have to conduct a component analysis because of the Federal Circuit's recent decision in *AstraZeneca AB v. Apotex Corp.,* 2015 WL 1529181 (Fed. Cir. 2015) permitted her to avoid doing so.  (*See* Exh. C at 273:17-23).  The *AstraZeneca* case, which involved pharmaceutical drugs designed to reduce gastric acids in the stomach, is easily distinguishable from this case. First, the Federal Circuit questioned whether its entire market value rule analysis should apply to pharmaceuticals as opposed to electronic devices. Second, the patents in AstraZeneca covered the entire accused products--the drug core, the coating, and the subcoating.  The Federal Circuit therefore held that there was no unpatented or non-infringing feature in the accused products.  *See AstraZeneca* at *11.  The accused WiFi access points in this case, by contrast, contain hundreds of unpatented and non-infringing features and components, none of which was considered by Dr. Mody in her damages analysis.

Dr. Mody also failed to follow the Federal Circuit's directives from the *VirnetX* case, which requires the patentee to conduct a ***further*** apportionment on the identified specific components to isolate the patentee's contribution to that component versus the non-patented contributions to the component. For the Court's reference, the allegedly-infringing components enable many other (and often fundamental) non-patented benefits involved in 802.11 wireless transmissions, including 1) Media Access Control ("MAC") protocols; 2) Physical Layer Protocols; 3) Multiple Input-Multiple Output ("MIMO") technology; 4) Security and Encryption; 5) Association/Disassociation; 6) Password Authentication; 7) Power Savings; 8) Station Management; 9)Acknowledgement/Retransmission; 10) Modulation/Coding; and 11) Orthogonal Frequency Division Multiplexing ("OFDM"). Other technology companies, including Ruckus, contribute to these fundamental features of the infringing components, and *VirnetX* required that Dr. Mody isolate these features from the patented technology. Dr. Mody failed to conduct any analysis regarding these features, or to isolate them.[7]

Pursuant to the Federal Circuit's explicit instructions, if a patentee wants to base damages on the entire product, as Dr. Mody has here, the patentee must prove that the demand for the entire product is attributable to the patented feature. Dr. Mody is not entitled to base damages on the entire product because she did not consider whether the patents-in-suit drive demand for the Ruckus accused products, and her report does not contain any opinion on this. In *LaserDynamics*, the Federal Circuit held that "patentees may not calculate damages based on the sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing the ***demand for the entire product is attributable to the patented feature.***"

---

[7] Even if Harris disputes that the infringing components include these particular additional features, it is undisputed that Dr. Mody failed to analyze the total features of the infringing components and isolate the patented features, as the Federal Circuit requires.

*LaserDynamics,* 694 F.3d at 70 (emphasis added).  In that case, the plaintiff alleged that the patented disc discrimination method drove demand for the accused laptop computers.  The Federal Circuit held that the plaintiff failed to present any evidence that the disc discrimination method drove demand.  *Id*. at 68.  In its holding, the Federal Circuit stated:

> It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer.  Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable.  Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product.  To name a few, a high resolution screen, responsive keyboard, fast wireless network receiver, and extended-life battery are all in a sense important or essential features to a laptop computer; take away any of one of those features and consumers are unlikely to select such a laptop computer in the marketplace.

*Id*.[8]

The only way Dr. Mody can avoid basing a damages analysis on particular components of the accused products is to opine and prove that the demand for the entire accused access points is attributable to Harris's patented technology, which she did not and cannot do.  Indeed, even if she opined (and she did not) that Harris's patented technology was valuable, important, or even essential to the functionality of the access points, it still would be insufficient to avoid a component analysis under the Federal Circuit's decision in *LaserDynamics*.   Even if the Court determines that Dr. Mody properly applied the EMVR, it still remains that she failed to conduct an apportionment analysis on the accused products.

In sum, in light of the Federal Circuit's guidance that juries should not be presented with entire revenues or profits absent sufficient proof that the entire market value rule is appropriate,

---

[8] District Courts have held the same.  *See, e.g.*, *Oracle Am., Inc. v. Google*, 798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. 2011) ("The fact that Java may be a critical component of Android does not justify application of the entire market value rule.")

testimony regarding unapportioned royalty figures is unreliable as a matter of Federal Circuit law under *Lucent*, *LaserDynamics*, *VirnetX*, etc.  Because Dr. Mody has not followed Federal Circuit guidance and properly apportioned the value of the accused products to the patents-in-suit by identifying and apportioning the components required for the patented technology, her damages numbers are overstated and unreliable, and her testimony should be excluded from trial.

## B.  DR. MODY'S METHODOLOGY VIOLATES RULE 702 AND *DAUBERT*

Dr. Mody's opinions are also flawed because they are based on unreliable methodology for at least the following three reasons.

**_First_**, Dr. Mody improperly compared the margins of the accused products to margin of non-accused products to determine the Alleged Incremental Margin.  Dr. Mody simply compared accused products with non-accused products, without ever analyzing whether the accused products were comparable in use, application, or features to the non-accused products.  Indeed, Dr. Mody admittedly failed to determine whether the patented features are the only difference between the accused and the non-accused products.  (*See* Exh. C at 214:6-21 ("**Q**. Is it your opinion that the only difference between the accused products and the non-accused products that you used in your analysis is that the accused products add the patented technology? **A**. The accused products are accused of practicing the patented technology. The non-accused products are not accused of practicing the patented technology… ***So I would say no is the proper answer to that question***.")) (emphasis added).

Dr. Mody admitted that she did not know if the non-accused products differed from the accused products in application or functionality.  She also failed to do anything, including asking Harris's technical expert, to determine if there are any differences between the accused products and the non-accused products.  (Exh. C  at 229:9-22).   In fact, there are many differences between the accused products and the non-accused products beyond just the inclusion of the

patented features, including the application, functionality, and intended users of the products. For example, the accused and non-accused products differ in significant respects, including available security features, reliability, throughput (*i.e.*, speed), and the number of simultaneous connections they can accommodate.  These differences affect price and gross margins, and undermine Dr. Mody's alleged methodology to isolate the value of the patented technology.

Further, while Dr. Mody claimed her methodology was to isolate the value of the patented technology, Dr. Mody admitted that she does not know if the ***only*** difference is that the Ruckus accused products incorporated the patented Harris technology, or whether the non-accused products differ in application or functionality.  (*Id.* at 213:17-217:9).  Finally, Dr. Mody admitted that she may have included replacement parts or accessories (such as wall brackets or cables) in the non-accused category of products.  (*Id.* at 246:12-247-7 ("**A.** So it could be that accessories are included."); *see also id.* 248:10-12 ("**Q.** But you may have calculated the margin on accessories, for example? **A.** I may have.")).  Clearly, a product accessory such as a wall bracket is not remotely similar to an entire accused access point, rendering Dr. Mody's margin analysis flawed and unreliable.  Accordingly, she does not have a reliable basis to allege that the margin difference she identifies between the Ruckus accused products versus the non-accused products is, in fact, solely attributable to the patented Harris technology.[9]

**Second**, Dr. Mody assumes that the ratio of Ruckus's operating expenses to its revenue (the "Operating Expense Ratio") represents the portion of Alleged Incremental Margin

---

[9] As a theoretical matter, an analysis that took an accused product selling for a certain price, and an identical product save that it omitted the two features covered by the Harris patents, could provide a starting point for valuing the patented features.  But that is not what Dr. Mody did. Instead, she took as one set the accused products, and as the comparison set all other Ruckus products, despite widely varying features (security features, reliability, throughput (i.e., speed), and number of simultaneous connections the products can accommodate).  That failure to select an appropriate comparison set renders Dr. Mody's opinions unreliable.

attributable to non-patented elements, and she attributes **all** of the remaining Alleged Incremental Margin to the patented technology.  (*See* Exh. B p. 5).  She does not provide any support for this assumption, but cursorily concludes that the Operating Expense Ratio is approaching 40%. (Exh. B p. 6).  She then attributes 60% (100% - 40%) of the Alleged Incremental Margin to Harris.  (*Id.*)

However, operating expenses represent the non-product costs incurred by a company to run its business, including legal, accounting, sales, human resources, and other general administration costs.  A company's operating expense level does not have any effect on its gross margin calculation, and there is no relationship between the Operating Expense Ratio and the gross margin attributable to the patented technology.  Indeed, under Dr. Mody's methodology, Ruckus could reduce the proposed royalty rates merely by hiring several accountants or sales personnel and thereby increasing its operating expenses, and lower Dr. Mody's royalty base.

**Third**, Dr. Mody improperly excludes Research & Development ("R&D") expenses from the operating expenses calculation.  (*See* Exh. B at p. 6, fn. 13).  Her reasons for doing so are untenable, claiming that engaging in R&D are not necessary to earn a profit and that R&D expenses are "at the discretion of management."  Dr. Mody's theories are unsupported and flawed because R&D is one of the **least** discretionary operating expenses for technology companies, such as Ruckus, where continued product development is critical for success.  Dr. Mody's decision to exclude R&D expenses from her calculation of the Operating Expense Ratio reflects a flawed approach to the damages calculation, underscoring the unreliable methodology adopted in arriving at her damages figure.

Even though a damages analysis can involve some approximation, "the Federal Circuit requires 'sound economic and factual predicates' for that analysis." *IP Innovation,* 705

F.Supp.2d at 689.  An expert opinion that seeks to determine a reasonable royalty is subject to exclusion where the opinion lacks an adequate factual basis, or fails to demonstrate that principles and methodology have been applied reliably to the facts of the case.  *Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.,* 219 F.R.D. 135, 141 (N.D. Iowa 2003).  Dr. Mody's reasonable royalty calculation rests on a series of flawed assumptions, and is not the product of reliable methodologies.  Because the basis of her calculations are overstated, her reasonable royalty rates are therefore likewise overstated, and her opinions must be excluded.

**V.     CONCLUSION**

Dr. Mody's opinion is neither based on a sound methodology and reliable facts, nor on the application of a sound methodology to the facts.  She ignored Federal Circuit directives for calculating damages in patent infringement cases and instead calculated damages on an impermissible use of the Entire Market Value Rule, without any analysis of the patented features as the sole driver of customer demand.  Therefore, Dr. Mody's proposed testimony will not be helpful to the jury, and her proposed opinion and testimony should be excluded, in its entirety.

Dated: April 17, 2015.                     Respectfully submitted,


*/s/ L. Scott Oliver*
L. Scott Oliver (*pro hac vice*)
scott.oliver@klgates.com
Ranjini Acharya (*pro hac vice*)
ranjini.acharya@klgates.com
K & L Gates LLP
630 Hansen Way
Palo Alto, CA 94304
Tel: 650 798 6765
Fax: 650 798 6701

Eric C. Rusnak (*pro hac vice*)
eric.rusnak @lgates.com
K&L GATES LLP

4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: 415 882 8200
Fax: 415 882 8220

Jonathan B. Morton
jonathan.morton@klgates.com
K & L Gates LLP
200 S Biscayne Blvd Ste 3900
Miami, FL 33131
Tel: 305 539 3300
Fax: 305 358 7095

*Counsel for Defendant-*
*Counterclaimant  Ruckus*
*Wireless, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 17, 2015, I electronically filed the foregoing with the Clerk of the Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Case of the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have registered to receive notices from the Court under the CM/ECF system.

*/s/ L. Scott Oliver*

## SERVICE LIST
6:11-CV-00618-CEM-KRS

| | |
|---|---|
| **Brian A.E. Smith**<br>Bunsow, De Mory, Smith & Allison, LLP<br>351 California St., Ste. 200<br>San Francisco, CA 94104<br>415.426.4729<br>Fax: 415.426.4744<br>Email: bsmith@bdiplaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* | **Henry C. Bunsow**<br>Bunsow, De Mory, Smith & Allison, LLP<br>351 California St., Ste. 200<br>San Francisco, CA 94104<br>415/675-8889<br>Fax: 415/675-8892<br>Email: hbunsow@bdiplaw.com<br>LEAD ATTORNEY<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* |
| **Christina Finn**<br>Bunsow, De Mory, Smith & Allison, LLP<br>351 California St., Ste. 200<br>San Francisco, CA 94104<br>415-426-4747<br>Fax: 415-426-4744<br>Email: cfinn@bdiplaw.com<br>LEAD ATTORNEY<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* | **Taylor Flanagan Ford**<br>King, Blackwell, Zehnder & Wermuth, PA<br>PO Box 1631<br>Orlando, FL 32802-1631<br>(407) 422-2472<br>Fax: (407) 648-0161<br>Email: tford@kbzwlaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* |

| | |
|---|---|
| **Denise M. De Mory**<br>Bunsow, De Mory, Smith & Allison, LLP<br>Suite 101<br>600 Allerton St<br>Redwood City, CA 94063<br>415/675-8889<br>Fax: 415/675-8892<br>Email: ddemory@bdiplaw.com<br>LEAD ATTORNEY<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* | **Thomas A. Zehnder**<br>King, Blackwell, Zehnder & Wermuth, PA<br>PO Box 1631<br>Orlando, FL 32802-1631<br>407/422-2472<br>Fax: 407-648-0161<br>Email: tzehnder@kbzwlaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* |
| **Frederick S. Wermuth**<br>King, Blackwell, Zehnder & Wermuth, PA<br>PO Box 1631<br>Orlando, FL 32802-1631<br>407/422-2472<br>Fax: 407/648-0161<br>Email: fwermuth@kbzwlaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* | **Alden K. Lee**<br>Bunsow, De Mory, Smith & Allison, LLP<br>351 California St., Ste. 200<br>San Francisco, CA 94104<br>415/426-4731<br>Fax: 415/426-4744<br>Email: alee@bdiplaw.com<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED<br><br>*Attorney for Plaintiff Harris Corporation* |