# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HARRIS CORPORATION,

      Plaintiff-Counterdefendant,

v.

RUCKUS WIRELESS, INC.,

      Defendant-Counterclaimant.

CASE NO.: 6:11-CV-00618-CEM-KRS

## PLAINTIFF HARRIS CORPORATION'S OPPOSITION TO DEFENDANT RUCKUS WIRELESS, INC.'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF DR. NISHA MARIE MODY, PH.D.

**TABLE OF CONTENTS**

PAGE NO.

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND .............................................................................. 2

III.  LEGAL STANDARD.......................................................................................... 6

      A.    Admissibility of Expert Testimony.................................................... 6

      B.    Patent Damages.................................................................................... 8

IV.   ARGUMENT..................................................................................................... 10

      A.    Dr. Mody's Opinions Are Admissible Because They
            Reliably Employ and Apply Federal Circuit Precedent To
            The Facts Of This Case................................................................... 10

      B.    Ruckus Has Not Produced The Financial Documents On
            Which Its Damages Expert Relies ................................................ 12

      C.    The Cases Ruckus Cites Do Not Support Excluding Any
            Portion of Dr. Mody's Report....................................................... 14

      D.    Dr. Mody's Methodology Is Reliable And Does Not
            Violate FRE 702 Or *Daubert* Principles........................................ 17

V.    CONCLUSION................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286, 1315 (Fed. Cir. 2014)` .............................................................. passim

*AstraZeneca AB v. Apotex Corp.*,
  2015 WL 1529181 (Fed. Cir. 2015)................................................................ 16

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F. Supp. 2d 346 (D. Del. 2006).................................................................. 7

*Ericsson Inc. v. D-Link Sys.*,
  773 F. 3d 1201 (Fed. Cir. 2014)................................................................ 10, 11

*Garretson v. Clark*,
  111 U.S. 120 (1884)................................................................................ 10

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116
  (S.D.N.Y. 1970) ..................................................................................... 8

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)....................................................................... 8

*In re Innovatio IP Ventures, LLC Patent Litig.*,
  MDL 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013).................................. 9, 11, 16

*LaserDynamics. Inc. v. Quanta Comp., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)....................................................................... 14

*LifeNet Health v. LifeCell Corp.*,
  2015 WL 1258984, *28 (E.D. Va., March 18, 2015) ................................................ 15

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F. 3d 1301 (Fed. Cir. 2009)............................................................... 8, 9, 15

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995)....................................................................... 8

*Uniloc USA. Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)................................................................ 10, 15

*VirnetX v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)................................................................ 15, 16

## TABLE OF AUTHORITIES

**<u>STATUTES</u>**

35 U.S.C. § 284 .................................................................................................... 1, 8, 10

**<u>RULES</u>**

Fed. R. Evid. 702 ...................................................................................................... 7

Fed. R. Evid. 703 ...................................................................................................... 7

## I.    INTRODUCTION

Defendant Ruckus Wireless, Inc.'s ("Ruckus") motion to exclude the testimony of Dr. Nisha Marie Mody, damages expert for Plaintiff Harris Corporation ("Harris"), is based on a fundamental misunderstanding and misapplication of Federal Circuit case law on patent damages – both recent and long-standing – and should be denied.

First, Ruckus fails to apply the general theories and rules of the cases it discusses to the actual facts of *this case*.  In fact, aside from a single fleeting reference that "Harris's patented technology involves the transmission of wireless signals involving the accused access points' WiFi radio and antenna and related circuitry," (Doc. 199 at 3) Ruckus never even attempts to describe the actual scope of what is covered by the asserted patent claims. Critically, however, analysis of the asserted claims is where the inquiry must begin, for the patentee is entitled to "damages adequate to compensate *for the infringement*, but in no event less than a reasonable royalty for the use made *of the invention* by the infringer."  35 U.S.C. § 284.  The proper inquiry evaluates the expert's methodologies in view of the full scope of the infringed claims.

Second, Ruckus admits, as it must, that its accused access points have only one function – facilitating wireless connection to the Internet.  The components Ruckus points to that allegedly require isolation and valuation separately are the "guts" of the access points – all wireless connections are made and facilitated by the WiFi radios and antennas within the access points.  Every use of the access points involves the components Ruckus points to. Ruckus' motion simply ignores the fact that the asserted claims in this case cover the access points themselves; thus, the proper analysis did occur.

Third, Ruckus' motion should be denied because each of Ruckus' three alleged "flaws" in Dr. Mody's analysis are properly addressed through cross-examination and thus, go to the weight not the admissibility of the Dr. Mody's opinions and testimony.  Even Ruckus' own damages expert admits Dr. Mody's methodology did not change in her 2015 Supplemental Report as compared to her 2012 Expert Report.  Each of the alleged "flaws" identified by Ruckus were therefore present in Dr. Mody's 2012 Expert Report and thus the deadline for lodging a *Daubert* challenge to that methodology was June 1, 2012.  (Doc. 28 at 2).  In 2012, Ruckus never challenged Dr. Mody's opinions or methodology on any grounds. Consequently, Ruckus waived the challenges it now advances.  But Ruckus once again ignores the clear deadlines set by this Court's Scheduling Orders and violates the Court's bar against relitigating issues that could or should have been addressed prior to the stay.

Finally, Dr. Mody could never have apportioned in the manner that Ruckus contends is proper because Ruckus has never produced the documents it now says are required for apportionment.  For this reason alone, Ruckus' *Daubert* motion must be denied.  A party cannot abuse and manipulate the discovery process, and then claim that an expert should be excluded because she did not rely on documents that the party did not produce.  For all of these reasons, Ruckus' motion should be denied.

## II.     FACTUAL BACKGROUND

On July 15, 2011, the Court issued its initial Case Management and Scheduling Order ("2011 Scheduling Order"), setting deadlines for initial disclosures, expert reports, and the close of discovery.  (Doc. 28 at 2).  In accordance with the expert disclosure deadlines set in the Court's 2011 Scheduling Order, on March 5, 2012, Harris identified Dr. Nisha Mody and

served the Expert Report of Dr. Nisha Marie Mody with respect to damages. Rebuttal expert disclosures followed on the deadline set in the 2011 Scheduling Order. On April 6, 2012, Ruckus served the Expert Report of Richard J. Ostiller regarding damages. On April 27, 2012, Ruckus deposed Dr. Mody. On May 4, 2012, Harris deposed Mr. Ostiller. Discovery closed on May 4, 2012. (Doc. 28 at 2).

Ruckus subsequently moved to stay the case pending the outcome of reexamination proceedings Ruckus had initiated at the USPTO. On March 29, 2013, Judge Honeywell stayed the case pending the reexamination of the '684 Patent. (Doc. 138). On June 17, 2014, Harris moved to lift the stay. (Doc. 140). On October 2, 2014, the Court granted Harris' motion and lifted the stay. (Doc. 145). Upon the Court's lifting of the stay, the parties filed a new case management report setting forth their positions and proposed schedules. (Doc. 165). At the telephonic case management hearing on November 25, 2014, the Court instructed the parties to further meet and confer and submit an amended case management report, admonishing the parties not to relitigate matters that could have or should have been previously presented. (Doc. 173, Nov. 25, 2014 Telephonic Conference Tr. at 9:1-3).

On January 7, 2015, following the telephonic hearing and parties' submission of their amended case management report (Doc. 171), the Court issued its current Case Management and Scheduling Order ("2015 Scheduling Order"), reciting a deadline for the "[p]arties to exchange *amended* burden-of-proof expert reports" on March 6, 2015, and for the "[p]arties to exchange rebuttal expert reports to *amended* expert reports" on April 3, 2015. (Doc. 176 at 1) (emphasis added).

On March 6, 2015, Harris served a supplemental report by Dr. Mody, with respect to updated damages accrued during the stay[1] and taking into account the issue date for the reexamination certificate of the '684 Patent.  Dr. Mody's analysis and methodology for arriving at a reasonable royalty remained substantially unchanged from the initial report served in 2012.[2]

On April 3, 2015, Ruckus served the Amended Expert Report of Richard J. Ostiller regarding damages, which uses a methodology for arriving at a starting point for the royalty rate that is entirely different from that used in the Ostiller 2012 Expert Report,[3] and relies on documents and witnesses never previously produced or identified by Ruckus.  On the following business day, April 6, 2015, Harris contacted Ruckus requesting to meet and confer regarding Harris' intent to file a motion to exclude Mr. Ostiller's Amended Report

---

[1] After the stay was lifted, Ruckus initially refused to produce any updated sales data for the time period covering the stay claiming that "discovery is closed."  (Doc. 165 at 5-6).  When it finally produced updated sales data, the data produced were inconsistent with the sales data produced before the stay.  For example, before the stay, there were sales recorded for the years 2005 and 2006, but no such sales for those years were present in the new database.  Despite multiple requests, Ruckus has not provided any explanation for the inconsistency in the two sets of data.

[2] Ruckus' expert Mr. Ostiller admits that Dr. Mody did not change her methodology.  *See* April 9, 2015 Deposition Transcript of the Deposition of Richard J. Ostiller (hereinafter "Ostiller Depo Tr."), a true and correct copy of which is attached hereto as Exhibit 1 at 231:23-232:12 ("But in many ways her report was very similar to what had been done before. She updated her numbers for more recent information, but there weren't a lot of significant changes."); *see also id*. at 261:5-11 ("Q. Okay. So you agree that Dr. Mody did not significantly modify her methodology in her supplemental report from the methodology in her initial 2012 report in this matter, correct? A. Yes, I would agree with that statement.") (objection to form omitted).

[3] *See* April 3, 2015 Amended Expert of Richard J. Ostiller, (hereinafter "2015 Amended Ostiller Report"), a true and correct copy of which is attached hereto as Exhibit 2 at ¶¶75, 77 ("[T]he market approach [which I utilized in my Initial Report] is not an appropriate method for determining a starting point for a reasonable royalty rate in this case."); *Id*. at ¶79 ("In this section, I discuss the use of the income approach to quantify a baseline rate in the determination of a reasonable royalty for the patents-in-suit."); Exhibit 1 (Ostiller Depo Tr.) at 261:23-25 ("The approach to an alternative damages in my amended report is different from my analysis in the initial report.").

and its request for Ruckus to produce the specified Ruckus documents which had never been produced and on which Mr. Ostiller's entire new theory is based.[4]  On April 7, 2015, counsel for the parties met and conferred telephonically regarding Harris's motion and the unproduced documents.  Thereafter, in response to Harris's request that Ruckus provide the Bates production numbers for the Excel files listed in Mr. Ostiller's List of Materials Considered (or produce them if they had not yet been produced), Ruckus instead added Bates production numbers to the *schedules* to Mr. Ostiller's Report and produced them.  Harris immediately followed up:

> [Y]esterday [Harris] indicated that Mr. Ostiller's report relies on documents that have never been produced to Harris.  Today's production does not remedy that deficiency.  Ruckus still has not produced the underlying native Excel documents on which Mr. Ostiller relies for his analysis.
>
> Please explain why these documents have never been produced to Harris.  Further, please explain why the two PDF documents produced on Friday, April 3, 2015, were never previously produced.  And finally, please explain why neither Craig Owen, nor Sandip Patel, have never [sic] been identified to Harris as persons with knowledge.[5]

Ruckus has never provided any explanation, including during the meet and confers regarding other motions to strike that have recently been filed by Harris.  The next day, on the morning of Dr. Mody's deposition, Ruckus produced updated schedules to Mr. Ostiller's Report with

---

[4] *See* April 6, 2015 Email from C. Finn to Counsel, (hereinafter "4/6/2015 Email Finn to Counsel"), a true and correct copy of which is attached hereto as Exhibit 3.

[5] *See* April 7, 2015 Email from C. Finn to Counsel, (hereinafter "4/7/2015 Email Finn to Counsel"), a true and correct copy of which is attached hereto as Exhibit 4.

Bates numbers.[6]  Ruckus still did not produce any of the underlying missing documents Mr. Ostiller relied upon in his Amended Ostiller Report.  Dr. Mody was deposed on Wednesday, April 8, 2015.  During Dr. Mody's deposition, counsel for Harris pointed out to Ruckus's counsel that Ruckus still had not produced the documents.  That afternoon at 3:30, after Dr. Mody's deposition had concluded and less than 18 hours before Mr. Ostiller's deposition was scheduled to begin, Ruckus produced documents purporting to "consist of the costed BOMs … requested earlier [that day]."[7]  However, the documents Ruckus produced were not the underlying Excel documents, as they are described on Mr. Ostiller's List of Materials Considered,[8] but were instead PDFs of Excel files that render them illegible.  In addition to being illegible, the PDF documents produced by Ruckus were without any metadata at all and did not even bear the same file names as listed in the Amended Ostiller Report.  Harris took the deposition of Mr. Ostiller on Thursday, April 9, 2015.  Ruckus has still not produced the documents identified and relied on in the Amended Ostiller Report.

## III.   LEGAL STANDARD

### A.   Admissibility of Expert Testimony

The admissibility of expert opinion testimony is governed by Rules 702  and 703 of the Federal Rules of Evidence.  Rule 702 pertains to testimony by expert witnesses:

---

[6] *See* two emails from Dunbar to Finn producing Ostiller schedules dated April 7, 2015 and April 8, 2015, (hereinafter "emails from Dunbar to Finn producing Ostiller schedules"), true and correct copies of which are attached hereto as Exhibits 5 and 6.

[7] *See* April 8, 2015 Dunbar email producing "costed BOMs" (hereinafter Dunbar email producing "costed BOMs"), a true and correct copy of which is attached hereto Exhibit 7.  In fact, Harris had requested the documents two days earlier, the first business day following the service of Mr. Ostiller's Amended Report.  *See* Exhibit 3 (4/6/2015 Email Finn to Counsel).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "Rule 702 requires that expert testimony assist the trier of fact… [and] it must 'fit' the issues in the case by having a valid connection to the pertinent inquiry.  The court 'must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.'"  *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 362 (D. Del. 2006) (internal citation omitted.)

"That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages. This court has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) (citations omitted).  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of

---

(...Continued)

8 *See* April 3, 2015 Ostiller Report, Attachment C – Materials Considered (hereinafter "Ostiller 2015 List of Materials Considered"), a true and correct copy of which is attached hereto as Exhibit 8.

relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).

### B.   Patent Damages

Title 35 U.S.C. Section 284 provides for the award of damages due a patentee upon a finding of infringement:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate *for the infringement*, but in no event less than a reasonable royalty *for the use made of the invention* by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284 (emphasis added).  In attempting to determine a reasonable royalty, a "common approach" utilized by litigants is the "hypothetical negotiation or the 'willing licensor-willing licensee' approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.… The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme.  The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. 3d 1301, 1324-25 (Fed. Cir. 2009) (internal citations omitted).  In *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970), the Court set forth 15 factors to be considered in a hypothetical negotiation analysis.  The factors have come be commonly known as the *Georgia Pacific* factors and are often referred to by number.  *See also*, *e.g.*, *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) (en banc).

When utilizing a hypothetical negotiation approach (as both parties do in this case), "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent* at 1325. It "is not an exact science." *Apple,* 757 F.3d at 1315. Further, the Federal Circuit recognizes there is not necessarily only one correct, reliable way to estimate a reasonable royalty, even within the same case where parties commonly select different approaches. *See id.* (*citing In re Innovatio IP Ventures, LLC Patent Litig.*, MDL 2303, 2013 WL 5593609, at *30-*40 (N.D. Ill. Oct. 3, 2013)). "For example, a party may use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or estimate the value of the benefit provided by the infringed features by a comparing the accused product to non-infringing alternatives. All approaches have certain strengths and weaknesses and, depending upon the facts, one or all may produce admissible testimony in a single case. . . . [T]he relative strengths and weaknesses may be exposed at trial or attacked during cross-examination. That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible." *Apple,* 757 F.3d at 1315.

In order to be reliable, and thus admissible, the damages analysis must be based on the asserted claims themselves, for failing to consider the entire claim runs the risk that "an otherwise sound methodology could appear unreliable (or, indeed, irrelevant) when applied to a single limitation, or a subset of limitations, rather than to the full set of infringed claims. This is why the proper inquiry evaluates the expert's methodology in view of the full scope of the infringed claims." *Apple,* 757 F.3d at 1317-18 (citing 35 U.S.C. § 284, other citations omitted). Thus, in determining whether to properly admit the testimony of a damages expert,

the inquiry is: "with the entire scope of the asserted claims and the correct claim construction in mind, [does the expert] employ[] reliable principles and methods, reliably appl[y]them, and rel[y] upon legally sufficient facts or data." *Apple*, 757 F.3d at 1317-18.

## IV.  ARGUMENT

### A.  Dr. Mody's Opinions Are Admissible Because They Reliably Employ and Apply Federal Circuit Precedent To The Facts Of This Case

Ruckus makes much of the fact that Dr. Mody did not change her analysis in the 2015 Supplemental Mody Report following the issuance of several Federal Circuit decisions since her 2012 Report was served.  But none of the cited Federal Circuit cases change the fundamental tenets of patent damages law as they apply to the facts of this case or Dr. Mody's analysis.  Both *Daubert* and Federal Circuit case law on damages say that the relevant inquiry is whether the expert "has justified the application of a general theory to the facts of the case."  *Uniloc USA. Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011*).*  That is precisely what Dr. Mody has done.

The apportionment law, properly applied by Dr. Mody, dates back to the Supreme Court's 1884 decision in *Garretson v. Clark*, 111 U.S. 120 (1884).  As the Federal Circuit has explained, *Garretson* requires apportionment of the value of the patent technology such that "the patent holder should only be compensated for the approximate incremental benefit derived from his invention."  *Ericsson Inc. v. D-Link Sys.,* 773 F. 3d 1201, 1233 (Fed. Cir. 2014).  And "[l]ogically, an economist could [determine the value added by both patented and unpatented features] in various ways--by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment

of the royalty rate so as to discount the value of a product's non-patented features; or by a

combination thereof." *Ericsson,* 773 F.3d at 1226.

Dr. Mody did conduct an apportionment analysis to isolate the value of the patented

technology by conducting an incremental margin analysis:

> What I've done is I've done a very, very rigorous quantitative analysis to
> determine and isolate the -- the value of -- to the product of the patented
> technology.
>
> So it could be that the other 69 percent of the margin is associated with
> Ruckus's own technology, with Ruckus's other features. But the 83 minus the
> 69, that -- that very specific incremental profit margin that is the amount over
> the products that don't practice is for the patented technology.[9]

Simply because Dr. Mody's method is different than the flawed method utilized by Ruckus'

expert, Mr. Ostiller,[10] does not render Dr. Mody's method unreliable.  As the Federal Circuit

has observed, there "may be more than one reliable method for estimating a reasonable

royalty."  *Apple*, 757 F.3d at 1315; *In re Innovatio,* 2013 WL 5593609, at *30-*40.

Indeed, it is Ruckus' approach in its expert report and motion that is the proper

subject of criticism.  The claims at issue in this case are drawn to access points containing

phased array antennas and wideband digital radios that receive and transmit digital signals

wirelessly, and to wireless networks that contain master and local access points configured to

communicate on a common wireless communication protocol, something Ruckus never

---

[9] *See* April 8, 2015 Deposition Transcript of Nisha Marie Mody, Ph.D., (hereinafter "Mody Dep. Tr."), a true and correct copy of which is attached hereto as Exhibit 9 at 216:9-19.

[10] Harris also filed a motion to exclude the opinions and amended expert report of Mr. Ostiller due to Ruckus's failure to produce the Ruckus financial documents on which Mr. Ostiller's opinions are based, as well as the violation of the Court's order barring re-litigation of issues that could have or should have been addressed in the 2012 expert reports prior to the stay.  (*See* Doc. 205).

analyzed in either of Ostiller's damages reports or its motion.   The Ruckus access points are single purpose devices that perform exactly and only the functions identified in the claims. Thus, there is no "smallest saleable unit" other than the access point itself.  Indeed, Ruckus inherently concedes this by proposing the entire guts of the access point as comprising the smallest saleable patent-practicing unit.

Further, Ruckus' motion fails to provide any factual or evidentiary support for most of its assertions.   Specifically, Ruckus does not provide any support or evidence for its argument that the patents are practiced by a subset of components – the WiFi radio and antenna and related circuitry.[11]  Nor does Ruckus provide any support for its representations with respect to the alleged non-patented benefits enabled by the components Ruckus asserts infringes.  (*See e.g.*, Doc. 199 at 12-14).  In fact, these representations, which Ruckus simply asserts as truths, are very much contested.  Ruckus' motion purports to describe the apparent methodology and assumptions that Mr. Ostiller made in his analysis.  But Ruckus does not cite to Mr. Ostiller's Amended Expert Report or the documents on which Mr. Ostiller relies.

## B.    Ruckus Has Not Produced The Financial Documents On Which Its Damages Expert Relies

Ruckus has not even produced the Ruckus financial documents (costed BOMs) on which Mr. Ostiller's entire new theory relies.  (*See* Doc. 205).  Because Ruckus has not produced these critical Ruckus documents as they are kept in the ordinary course of business or not even provided them to Harris in the same format in which they were provided to Mr.

---

[11] Indeed, no Ruckus witness, including its three experts, have ever testified or opined that anything less than the entire access point infringes any of the asserted claims.

Ostiller,[12] despite repeated requests to do so,[13] Harris' ability to respond to and challenge the assertions made by Ruckus in its motion is severely limited if not impossible.  And, Dr. Mody never had access to the documents Ruckus faults her for failing to consider.

As discussed above, the business day immediately following the service of Mr. Ostiller's Amended Report, Harris identified documents on which Mr. Ostiller relies that have never been produced.  In response to Harris's request that Ruckus provide the Bates production numbers for the Excel files listed in Mr. Ostiller's List of Materials Considered (or produce them if they had not yet been produced), Ruckus instead added Bates production numbers to the *schedules* to Mr. Ostiller's Report and produced those instead – essentially ignoring Harris' request.   Harris immediately followed up, explaining the continuing deficiency and requesting an explanation.[14]  Ruckus has never provided any explanation, and the next day, *on the morning of Dr. Mody's deposition*, Ruckus again produced *schedules* to Mr. Ostiller's Report with Bates numbers rather than the Ruckus documents themselves to which Mr. Ostiller had access.[15]  During Dr. Mody's deposition, counsel for Harris pointed out to Ruckus's counsel that Ruckus still had not produced the documents.  *After Dr. Mody's deposition had concluded*, Ruckus produced documents purporting to "consist of the costed

---

[12] Ruckus provided the costed BOMs to Mr. Ostiller in Excel-file format.  *See*, *e.g.*, Exhibit 1 (Ostiller Depo Tr.) at 251:4-11; 278:20-22; 282:7-15.

[13] *See*, *e.g.*, Exhibit 1 (Ostiller Depo Tr.) at 291:15-292:4 (requesting production of documents in native Excel format).

[14] *See* Exhibit 4 (4/7/2015 Email Finn to Counsel).

[15] *See* Exhibits 5 and 6 (emails from Dunbar to Finn producing Ostiller schedules).

BOMs … requested earlier [that day]."[16]  However, the documents Ruckus produced were not the underlying Excel documents, as they are described on Mr. Ostiller's List of Materials Considered,[17] but were instead PDFs of Excel files that render them illegible.  In addition to being illegible, the PDF documents produced by Ruckus were without any metadata at all and did not even bear the same file names as listed in the Amended Ostiller Report.  As static PDFs, they are not usable for any sort of analysis.

C.     **The Cases Ruckus Cites Do Not Support Excluding Any Portion of Dr. Mody's Report**

The recent Federal Circuit cases Ruckus relies on simply reiterate, and where required, clarify, pre-existing factors that were required in a patent damages analysis.  None of these cases require an analysis of the "cost and profitability" of the WiFi radio, antenna, and related circuitry of Ruckus' accused access points in this case.  Ruckus alleges that recent Federal Circuit case law now dictates that "[t]he EMVR can no longer be used to assess damages with a multi-component product, such as the accused WiFi access points, because the alleged infringement relates only to a few of the hundreds of components that make up the product."  (Doc. 199 at 8).  Ruckus is wrong as a matter of law.  The EMVR can still be used for multi-component products where the requisite conditions for doing so are met.  *LaserDynamics. Inc. v. Quanta Comp., Inc.,* 694 F.3d 51, 67-68 (Fed. Cir. 2012).

---

[16] *See* Exhibit 7 (Dunbar email producing "costed BOMs").  In fact, Harris had requested the documents two days earlier, the first business day following the service of Mr. Ostiller's Amended Report.  Exhibit 3 (4/6/2015 Email Finn to Counsel).

[17] *See* Exhibit 8 (Ostiller 2015 List of Materials Considered).

In the Federal Circuit cases relied on by Ruckus in which an analysis of a smaller component of the entire product was required, the larger product infringed simply by virtue of containing a smaller infringing component but all of these cases have no applicability here because there is no "smaller component" of the access points that infringe the patents-in-suit. *See LifeNet Health v. LifeCell Corp.,* 2015 WL 1258984, *28 (E.D. Va., March 18, 2015) ("the patent only covered the component part and not the entire product."). The Court in *LifeNet Health* explained each of the patented features in each of the Federal Circuit cases cited by Ruckus as follows: in *Virnetx, Inc. v. Cisco Systems, Inc.,*[18] the "patent covered security over networks used in Apple's iPhone, iPod, iPad, and Mac computers, but damages were based on the market value of the products;" in *Laser Dynamics,* the "patent only covered an optical disc drive, but damages were based on the entire computer;" in *Uniloc*, the "patent only covered Microsoft's Product Activation feature, but royalty was based on sales of Microsoft Office;" and in *Lucent,* the "patent at issue covered only the date-picker tool in Microsoft Outlook, but was only 'a very small component of a much larger software program.'" *See LifeNet Health.,* 2015 WL 1258984 at *28.

There is no such analogous description here for the asserted claims – the WiFi radio does not infringe by itself; the antenna does not infringe by itself.[19] Nor does Ruckus contend that either does. Here, the patented claims cover the access point itself, not just the

---

[18] *VirnetX v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014).

[19] Ruckus also alleges that the antenna and WiFi radio "related circuity" are included within those components that must allegedly be analyzed, but in an access point, nearly ***all*** of circuitry is related to the antennas and radios.

"features" of it.  *See id*. at *80; *see also*, *AstraZeneca AB v. Apotex Corp.,* 2015 WL 1529181 (Fed. Cir. 2015) (refusing to hold that the EMVR is per se inapplicable to pharmaceutical cases, yet finding that case before it "does not fit the pattern in which the entire market value rule applies" where the asserted patents "cover[ed] the infringing product as a whole, not a single component of a multi-component product.")  Accordingly, the cases cited by Ruckus have no applicability to the facts of **this case**. [20]

Further, Ruckus' citation to *VirnetX* as requiring an analysis of "the relevant components that perform the accused functionality" is misplaced.  *VirnetX* simply requires a further apportionment if the smallest salable unit is also itself a multi-component product.  In this case, because the smallest salable patent-practicing unit is the access point itself, Dr. Mody properly conducted an apportionment of the access points by determining an incremental gross margin associated with each of the asserted patents for the access points by first deriving gross margins both for those products accused of practicing the '515 and the '684, and then deriving gross margins for those products not accused of practicing either patented invention.  Relying primarily on the *Georgia-Pacific* factors directed to apportionment ("*Georgia-Pacific* factor #13 (i.e., the portion of the realizable profit that should be credited to the invention as distinguished from nonpatented elements, the

---

[20] Likewise, *In re Innovatio*, 2013 WL 5593609, does not compel this result either.  Ruckus' argument that the royalty base must be limited to only the WiFi chip is wrong as a matter of law.  In *In re Innovatio*, the court limited the royalty base to the WiFi radio in the context of determining the FRAND rate for a set of standard essential patents for the 802.11 standard.  None of those facts are present in this case.  There is no dispute that the asserted patents in this case are not directed the 802.11 standard itself and the asserted patents are not practiced by the WiFi radio alone.  Thus, the district court's analysis does not apply here.

manufacturing process, business risks, or significant features or improvements added by the infringer) and factor #8 (i.e., the established profitability of the product made under the patent; its commercial success; and its current popularity)"[21]), Dr. Mody's "margin analysis attempts to derive the incremental profit associated with the patents in suit.  It attempts to control for non-patented components and contributions to isolate the value of the '684 and '515 patents."[22]

### D.      Dr. Mody's Methodology Is Reliable And Does Not Violate FRE 702 Or *Daubert* Principles

Ruckus' motion identifies three alleged "flaws" in Dr. Mody's analysis.  First, Ruckus takes issue with Dr. Mody's comparison of the margins of the accused products to those of a set of non-accused products to determine an incremental margin.  (*See* Doc. 199 at 16-17).  Second, Ruckus faults Dr. Mody for using the ratio of Ruckus's operating expenses to its revenue (the "Operating Expense Ratio") as a measure of the portion of incremental margin that is attributable to non-patented elements and then allocating the remainder to Harris' patented technology.  (*See* Doc. 199 at 17-18).  Third, Ruckus alleges that Dr. Mody improperly excluded research & development expenses from the operating expenses calculation.  (*See* Doc. 199 at 18-19).  Each of Ruckus' arguments should be rejected for multiple reasons.

First, as Ruckus' own damages expert admits, Dr. Mody's analysis and methodology for arriving at a reasonable royalty remained unchanged from the initial report served in

---

[21] Exhibit 10 (Supplemental Expert Report of Dr. Mody) at 4.

[22] *Id*. at 5.

2012.[23]  Dr. Mody's Supplemental Report accounted for additional sales data provided by Ruckus since the case was stayed, and adjusted the damages period for the '684 Patent based on the issue date of the reexamination certificate containing amended claims.  Thus, Ruckus cannot dispute that each of the alleged "flaws" now identified by Ruckus were present in Dr. Mody's 2012 Expert Report.  The deadline for lodging any *Daubert* challenges to the methodology and opinions Ruckus now complains about was June 1, 2012.  (Doc. 28 at 2). Upon lifting the stay, the Court "barred [the parties] from re-litigating issues that could have been addressed prior to the stay; however, the parties were permitted, through claims construction, *Daubert* motions, and dispositive motions, to address any changes to both the '515 and '684 Patents that arose during reexamination."  (Doc. 190 at 2 (*citing* Doc. 176, Case Mgmt. & Scheduling Order and Doc. 173, Nov. 25, 2014 Telephonic Conference Tr. at 9:1–12).  Ruckus' counsel even explicitly represented to the Court that it would not relitigate issues that could have been addressed prior to the stay.  (Doc. 173, Nov. 25, 2014 Telephonic Conference Tr. at 6:24-7:4).  But in 2012, Ruckus never filed a *Daubert* motion challenging Dr. Mody's opinions or methodology on any grounds.  Thus, Ruckus waived the challenges it now advances and violated the Court's order barring relitigating issues that could have been addressed prior to the stay.

Second, each of Ruckus three alleged "flaws" in Dr. Mody's analysis are properly addressed through cross-examination and thus, go to the weight rather than the admissibility,

---

[23] Exhibit 1 (Ostiller Depo Tr.) at 231:23-232:12 ("But in many ways her report was very similar to what had been done before. She updated her numbers for more recent information, but there weren't a lot of significant changes."); *see also id.* at 261:5-11 ("Q. Okay. So you agree that Dr. Mody did not significantly modify her
(Continued...)

of Dr. Mody's opinions and testimony.  With respect to Ruckus' argument that Dr. Mody's comparison of the margins of the accused products to those of a set of non-accused products to determine an incremental margin was in error, Ruckus simply argues, without citation to any evidence that "there are many differences between the accused products and the non-accused products beyond just the inclusion of the patented features, including the application, functionality, and intended users of the products."  (Doc. 199 at 16-17).  Harris disputes Ruckus' unsupported argument.  Both the accused and non-accused sets of products are Ruckus access points for connecting devices wirelessly to the Internet, and are thus sufficiently comparable.[24]  Thus, Ruckus' unsupported distinction is without a difference and is not a basis for excluding Dr. Mody's opinions.

Ruckus' misplaced arguments regarding Dr. Mody's allocation of the operating expense ratio between Ruckus' accused products and Harris' patented technology and exclusion of R&D expenses from the operating expenses calculation fail for similar reasons. Regarding Dr. Mody's allocation of the incremental margin between Ruckus and Harris' patented technology, Dr. Mody ties the allocation to Ruckus' own Operating Expense Ratio. This is not an arbitrary allocation, but rather one that is tied to the facts of the case.  Again,

---

(...Continued)

methodology in her supplemental report from the methodology in her initial 2012 report in this matter, correct? A. Yes, I would agree with that statement.") (objection to form omitted).

[24] Dr. Mody did not admit, nor has Ruckus demonstrated that her non-accused category of products included accessories, as Ruckus implies.  (Doc. 199 at 17).  Rather, Dr. Mody indicated that because the new data set produced by Ruckus does not contain all of the same fields and identifiers as the data set produced by Ruckus in 2012 and for which a Ruckus witness provided testimony, Dr. Mody identified the comparable non-accused products based on the information available.  She offered to simply remove any products from the comparison set if Mr. Ostiller or Ruckus identifies any "accessories" that were inadvertently included.  Neither Mr. Ostiller in his amended report or in his second deposition, nor Ruckus in this *Daubert* motion, actually identify any such products that should be removed.

Ruckus simply disagrees with Dr. Mody's methodology.  And Ruckus' complaint about Dr. Mody's exclusion of research and development expenses is equally meritless.   Dr. Mody provided two valid reasons for the exclusion: (1) "R&D in any given period is not understood as necessary to earn operating revenue/profits in that period" and (2) "R&D investment is at the discretion of management" such that two companies with otherwise identical expenses might have different operating expenses where management elects to spend differently on research and development.[25]  As Ruckus's motion admits, Ruckus simply disagrees with her reasoning, not her methodology.  That is not a basis for excluding her opinions, but rather something Ruckus is free to explore on cross-examination.  But "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'" *Apple,* 757 F.3d at 1315 (citations omitted), and thus Ruckus' factually and legally unsupported arguments go the weight, not the admissibility, of Dr. Mody's opinions.

## V.   CONCLUSION

For the all of these reasons, the Court should deny Ruckus' motion.

---

[25] Exhibit 10 (Supplemental Expert Report of Dr. Mody) at n.12.

Dated:  May 4, 2015

/s/ Brian A.E. Smith
Henry C. Bunsow (*admitted PHV*)
Denise M. De Mory (*admitted PHV*)
Brian A.E. Smith (*admitted PHV*)
Alden K. Lee (*admitted PHV*)
Christina Finn (*admitted PHV*)
BUNSOW, DE MORY, SMITH & ALLISON LLP
351 California Street, Suite 200
San Francisco, CA 94104
Telephone:  (415) 426-4747
Facsimile:   (415) 426-4744
hbunsow@bdiplaw.com
ddemory@bdiplaw.com
bsmith@bdiplaw.com
alee@bdiplaw.com
cfinn@bdiplaw.com

Thomas A. Zehnder
Florida Bar No. 0063274
Frederick S. Wermuth
Florida Bar No. 0184111
Taylor F. Ford
Florida Bar No. 0041008
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
Post Office Box 1631
Orlando, FL 32802-1631
Telephone:  (407) 422-2472
Facsimile:   (407) 648-0161
tzehnder@kbzwlaw.com
fwermuth@kbzwlaw.com
tford@kbzwlaw.com

*Counsel for Plaintiff-Counterdefendant*
*HARRIS CORPORATION*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 4, 2015, I electronically filed the foregoing with the Clerk of the Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Case of the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have registered to receive notices from the Court under the CM/ECF system.

Dated:  May 4, 2015

*/s/ Brian A.E. Smith*

Brian A.E. Smith, *PVH*

*Counsel for Plaintiff-Counterdefendant*
*HARRIS CORPORATION*